United States District Court
Southern District of Texas
**ENTERED**
February 07, 2017
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HARRIS CAPROCK COMMUNICATIONS, INC., Plaintiff, | § § § § | |
| v. | § § | CASE NO. 4:15-CV-0130 |
| TRIPPE MANUFACTURING COMPANY dba TRIPP LITE dba TRIPP LITE HOLDINGS INC. Defendant. | § § § § § | |

## MEMORANDUM AND ORDER

Pending before the Court is Defendant Trippe Manufacturing Company's ("Trippe") Motion to Strike and Exclude the Testimony of Plaintiff's Expert Witnesses ("Motion") [Doc. # 36]. Plaintiff Harris CapRock Communications, Inc. ("Harris") has filed a Response [Doc. # 41]. Trippe has neither filed a Reply nor requested additional time to do so. Having reviewed the record and relevant legal authorities, the Court **denies** the Motion.

## I.     BACKGROUND

This lawsuit arises from a fire that ignited in the early morning hours of Sunday, March 3, 2013, at Harris's global headquarters, located in Houston, Texas.[1]  The record reflects the following.  The fire was contained to "Teleport/TelOps Building C," a freestanding, detached modular steel building located behind the main facility and used for operations maintenance and

---

[1] Affidavit of Kevin S. McElroy, Exh. 3 to Harris Response ("Affidavit of Kevin S. McElroy") [Doc. # 41-3], at 1 ¶ 3.

equipment storage.[2] The Houston Fire Department responded soon after receiving notice of the fire, extinguishing it within hours.[3] Observing that the "[f]ire appeared to have started in the middle of the room," the Fire Department, after learning Building C had been vacant for the two days prior to the fire, suspected arson and called in the Houston Arson Bureau.[4]

Based on its investigation of the scene and interviews with firefighters and Harris employees who worked in the building, the arson investigators concluded the fire originated on or near two plastic carts, whose fire-damaged remains were in the center of the room, when equipment on the carts malfunctioned.[5] By the time the arson investigators arrived on the scene the carts' contents had fallen to the floor.[6] The arson investigators photographed the area as they observed it before engaging in what one of Harris's experts refers to as "minimal reconstruction" of the scene, including attempting to place several of the items back onto the carts.[7] The Houston Arson Bureau classified the fire an accident.[8]

Harris retained fire investigator Joseph Ellington, who was the first person to

---

[2]   *Id.*; Joseph Ellington Report of Findings, dated December 11, 2015, Exh. A to Motion ("Ellington Report") [Doc. # 36-1], at 4, at ECF 7.

[3]   Fire Incident Report, dated March 4, 2013, Attachment B to Exh. A to Motion ("Fire Incident Report") [Doc. # 36-1], at ECF 45.

[4]   *Id.*

[5]   Houston Arson Investigative Report, dated March 16, 2013, Attachment C to Exh. A to Motion ("Houston Arson Investigative Report") [Doc. # 36-1], at ECF 54-56. The Report's authors did not specify what kind of alleged malfunction occurred.

[6]   Ellington Report [Doc. # 36-1], at 5, at ECF 8.

[7]   *Id.*

[8]   *Id.* at ECF 55.

survey Building C after it was released by the Houston Fire Department.[9] On March 5 and 6, 2013, Ellington inspected Building C, taking more than three hundred photographs of the scene over the course of the two days.[10] Ellington's goal in conducting the initial inspection was to document and preserve the scene and physical evidence.[11] Relying on information provided by Kevin S. McElroy, who, at the time of the incident, was a Teleport Engineer responsible for the equipment in the building, Ellington attempted to identify where each of the fallen items would have been located on the carts prior to the fire.[12]

Ellington concluded that the fire originated on the northern-most of two carts (the "north cart"). He "bagged and tagged" as evidence items that were on both the north and south carts, among other items.[13] Ellington apparently positioned those items where the north and south carts typically stood.[14]

Approximately a week later, on March 11, 2013, Ellington and Kevin R. Davis, an engineer and fire investigator retained by Harris's insurer, conducted a

---

[9] Kevin R. Davis Report, dated November 11, 2015, Exh. D-1 to Motion ("November 2015 Davis Report") [Doc. # 36-4], at 1. Harris employees secured Building C after the Houston Fire Department and Arson Bureau investigators vacated the scene. Affidavit of Kevin S. McElroy [Doc. # 41-3], at 2 ¶ 5.

[10] November 2015 Davis Report [Doc. # 36-4], at 1.

[11] Ellington Report [Doc. # 36-1], at 4, at ECF 7.

[12] *Id.* at 5, at ECF 8; Declaration of Joseph Ellington, dated January 18, 2017, Exh. 4 to Harris Response ("Ellington Declaration") [Doc. # 41-4], at 2 ¶ 9.

[13] Ellington Declaration [Doc. # 41-4], at 2 ¶ 10; List of Physical Evidence, Attachment H to Exh. A to Motion [Doc. # 36-1], at ECF 70.

[14] *See* Ellington Declaration [Doc. # 41-4], at 2 ¶ 9; Ellington Report [Doc. # 36-1], at 5, at ECF 8; November 2015 Davis Report [Doc. # 36-4], at 6.

joint examination of Building C at Harris's request.[15] Davis ultimately concluded that the source of the fire was a Trippe Uninterruptible Power Supply system ("UPS"), which was located at the time of the fire on the bottom shelf of the north cart.[16] Ellington accordingly notified Trippe of the fire, in accordance with fire investigation protocol.[17] On April 17, 2013, Ellington and Davis conducted a joint examination of the scene with, among others, Trippe's retained fire origin and cause experts.[18]

Harris filed suit against Trippe in the 164th Judicial District Court of Harris, County, Texas, asserting claims of strict products liability and breach of implied warranties.[19] Trippe timely removed the case to federal court [Doc. # 1]. Trippe now moves to exclude the expert opinions proffered by three of Harris's designated experts. Harris has responded in opposition. The Motion is ripe for disposition.

## II. MOTIONS TO EXCLUDE

Trippe has moved to exclude the expert opinions of Harris experts Joseph Ellington, Kevin R. Davis, and Thomas W. Eagar, Sc.D.

---

[15] Ellington Report [Doc. # 36-1], at 8, at ECF 11.

[16] November 2015 Davis Report [Doc. # 36-4], at 32.

[17] Ellington Declaration [Doc. # 41-4], at 3 ¶ 11; NATIONAL FIRE PROTECTION ASSOCIATION, GUIDE FOR FIRE AND EXPLOSION INVESTIGATIONS § 11.3.5.7 (2011 ed.) ("NFPA 921-2011"), Exh. 2 to Harris Response [Doc. # 41-2], at ECF 12.

[18] Ellington Declaration [Doc. # 41-4], at 3 ¶ 11, 4 ¶¶16-17.

[19] *See* Plaintiff's Original Petition, Jury Demand, and Request for Disclosure, *Harris Caprock Communications, Inc. v. Trippe Manufacturing Company d/b/a Tripp Lite and Tripp Lite Holdings, Inc.*, Cause No. 2014-73406 (164th Dist. Ct., Harris County, Tex. Dec. 19, 2014) [Doc. # 1], at 1-2; [Doc. # 1-2], at 4-5.

### A.   Legal Standard

Witnesses who are qualified by "knowledge, skill, experience, training or education" may present opinion testimony to the jury.  FED. R. EVID. 702; *see, e.g.*, *Whole Woman's Health v. Hellerstedt*, __ U.S. __, 136 S. Ct. 2292, 2316 (2016); *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (*en banc*); *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).  To be admissible, an expert's proffered testimony must be both relevant and reliable.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591-92 (1993); *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 (5th Cir. 2016).

The expert testimony must be relevant and the expert's proposed opinion must be one that would assist the trier of fact to understand or decide a fact in issue.  *See Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 529 (5th Cir. 2015); *Bocanegra v. Vicar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003) (citing *Daubert*, 509 U.S. at 591-92).  "A party seeking to introduce expert testimony must show (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  *Huss*, 571 F.3d at 452 (citing *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007)); *see also Carlson*, 822 F.3d at 199.

"Reliability" requires that the proponent of the expert testimony must present some objective, independent validation of the expert's methodology.  *See Brown v. Illinois Cent. R. Co.*, 705 F.3d 531, 536 (5th Cir. 2013).  The objective of the Court's gatekeeper role is to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Hodges v. Mack Trucks Inc.*, 474 F.3d 188, 194 (5th Cir. 2006).

The Court's gatekeeping role is no substitute, however, for the adversarial process. See *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 852 (5th Cir. 2015).

### B. Joseph Ellington

Ellington, the regional fire division manager of Rimkus Consulting Group, is a fire investigator certified by the National Association of Fire Investigators and the International Association of Arson Investigators with over thirty years' experience in advanced technical investigations generally. Ellington has expertise in investigating fires of unknown or disputed origin, and in causes and responsibility of fires and explosions.[20] Based on Ellington's detailed examination of the scene of the fire, including observable fire damage and burn patterns in the building and its contents, he opines that the fire originated on the lower level of the north cart.[21] In reliance upon his investigation and the opinion of Kevin Davis, another Harris expert, Ellington adopts the conclusion that the Trippe UPS caused the fire.[22] Ellington ruled out other potential origins of the fire.[23]

---

[20] *See* CV of Joseph Ellington, Exh. 4-A to Harris Response [Doc. # 41-4], at 1, at ECF 5.

[21] Ellington Report [Doc. # 36-1], at 2 ¶ 1, at ECF 5; Ellington Declaration [Doc. # 41-4], at 1-2 ¶ 5.

[22] Ellington Report [Doc. # 36-1], at 7-8, at ECF 10-11; Ellington Declaration [Doc. # 41-4], at 2 ¶ 7.

[23] Ellington Report [Doc. # 36-1], at 6-7, at ECF 9-10; Ellington Declaration [Doc. # 41-4], at 3 ¶ 12.

6

Trippe seeks to exclude Ellington's testimony on two grounds.  First, Trippe contends that Ellington's opinion that the north cart was the origin of the fire is purely speculative.  Second, Trippe argues that Ellington's opinions are unreliable because he failed to comply with standard fire investigation protocol when he "bagged and tagged" evidence selectively and without cause.

Ellington's expert opinions are based upon his multiple examinations of the fire scene, evidence secured from Building C, the reports of the Houston Fire Department and Houston Arson Bureau, and Davis's reports.  They are sufficiently reliable as required by *Daubert*, *Kumho* and Federal Rule of Evidence 702.  Ellington concluded that the fire originated on the north cart based upon the burn patterns in the building and on various items within it.[24]  To the extent Trippe urges the Court to strike Ellington's testimony because Ellington personally fails specifically to identify the Trippe UPS as the cause of fire, the argument is unavailing.  Ellington may testify to his opinion on the point of origin of the fire and rely on other reliable expert testimony in concluding the precise cause at that origin.  *See* FED. R. EVID. 702 Advisory Committee's note to 2000 amendment ("The term 'data' is intended to encompass the reliable opinions of other experts.")  It is an approved practice in fire investigations for a fire investigator to consult persons with specialized knowledge or experience that the investigator lacks.[25]

Trippe also contends that Ellington's testimony is unreliable because of the way he identified items to save as evidence.  The 2011 edition of the National Fire

---

[24] *See* Ellington Declaration [Doc. # 41-4], at 2 ¶ 10; Ellington Report [Doc. # 36-1], at 6, at ECF 9.

[25] *See* NATIONAL FIRE PROTECTION ASSOCIATION, GUIDE FOR FIRE AND EXPLOSION INVESTIGATIONS § 15.5.1 (2014 ed.) ("NFPA 921-2014"), Exh. 1 to Harris Response [Doc. # 41-1], at ECF 16.

Protection Association Guide for Fire and Explosion Investigations ("NFPA 921-2011)[26] specifically contemplates the alteration and movement of evidence, including collecting and removing physical evidence in order to test items or to ensure their preservation.[27]  NFPA 921-2011 affords discretion to the fire investigator in determining what physical evidence to collect.[28]  Further, during the April 17, 2013 joint examination of the scene, Trippe's experts had the opportunity to—and in fact did—identify as additional evidence items Ellington had not originally "bagged and tagged."[29]  Trippe's arguments challenging Ellington's decisions regarding which evidence to collect and the significance to be drawn from his examinations go to the weight rather than to the admissibility of his opinions.  Trippe may cross-examine Ellington on these matters, as needed to test his conclusions and their bases.

### C.     Kevin R. Davis

Kevin R. Davis is a certified fire investigator and licensed engineer.[30]  He holds a BS in Electrical Engineering, and is a member of the National Association of Fire Investigators and the Institute of Electrical and Electronic Engineers,

---

[26]   Trippe cites the 2014 edition of the NFPA 921 in challenging Ellington's expert opinion.  As Harris correctly points out, that edition had not yet been released at the time Ellington examined the fire scene.  Accordingly, the Court considers both NFPA 921-2014 and its predecessor, the 2011 edition.

[27]   *See* §§ 11.3.5.6 & 16.2.2 of NFPA 921-2011, Exh. 2 to Harris Response [Doc. # 41-2], at ECF 12-13.

[28]   *Id.* at § 16.2.2, at ECF 13.

[29]   *See* Ellington Declaration [Doc. # 41-4], at 4 ¶ 17.

[30]   November 2015 Davis Report [Doc. # 36-4], at ECF 36.

among other organizations.[31] He is presently employed as a professional engineer by Goodson Engineering.[32]

Davis provides various opinions. Trippe seeks to exclude Davis's conclusions because they allegedly are not supported by "any" *Daubert* reliability factors. More specifically, Trippe argues that Davis's opinions are unreliable because they are based on evidence that was "cherry-picked" by Ellington. Trippe also contends that Davis's opinions on the source of the ignition and the "first fuel" are not reliable. Harris has provided persuasive arguments in response.

First, it is noted that there is ample support in the record for the methodology Davis adopted to analyze the evidence Ellington and others analyzed. *See* Section II.B, *supra*. Trippe's contention that the evidence was "cherry-picked" evidence ignores Davis's and Ellington's cited references and reliance on techniques approved in NFPA 921, practices in the fire investigation industry, and Ellington's personal close examinations of the fire scene and the condition of many items found there. *See, e.g.*, Section II.B *supra*. Further, Davis arrived at his opinions based on, *inter alia*, his own detailed examinations of the fire scene, tests he conducted on the evidence Ellington "bagged and tagged," and scrutiny of other Trippe UPS exemplars. As noted, Trippe had the opportunity to add to the evidence items that Ellington had not chosen, and did so. This challenge is without merit.

Davis's opinions that Trippe particularly challenges are that the origin of the fire was wires at the front of the Trippe UPS; that the source of ignition of the fire was an internal electrical failure of the Trippe UPS; and that the first fuel ignited

---

[31] *Id.*

[32] *Id.*

was debris that collected in the UPS unit, which then set aflame the plastic bezel on the front of the Trippe UPS.[33] For reasons summarized below, the Court denies Trippe's Motion regarding Davis's opinions because the challenges are essentially attacks on the weight his conclusions should be given, matters for the fact finder.

Trippe argues that Davis's opinions regarding the source of ignition at the UPS and the "first fuel" that started the fire are speculative and unreliable because, for instance, Davis does not know that there was debris in the UPS unit at issue and did not test the flammability of the north cart. These assertions technically are true. However, the UPS was essentially destroyed in the fire and it was impossible to ascertain whether dust or debris was in pertinent parts of the UPS. Davis, however, found debris or dust in one or more exemplar UPS units. Second, Harris's third expert, Thomas W. Eagar, Sc.D., supplies considerable support for Davis's opinions.[34] Further, the flammability rating of the north cart is a matter ascertainable from independent sources by experts, including those Trippe retained.[35] The approaches Davis has taken to theorize the conditions of the UPS at the time of the fire, and to eliminate other potential causes of ignition and first fuel of the fire, has support in the specialized arena of fire investigation.[36]

---

[33] *Id.* at ECF 32.

[34] Thomas W. Eagar Rebuttal Report, dated May 23, 2016, Exh. 6-B to Harris Response ("Eagar Report") [Doc. # 41-6], at 2-5, 14, at ECF 3-6, 15.

[35] *See* Deposition of Russell A. Ogle, Exh. 7 to Harris Response [Doc. # 41-7], at 10 lines 2-7, at ECF 2 (indicating there is "no need" to test the flammability of the north cart because the flammability characteristics of the plastic comprising it are well known).

[36] *See* NFPA 921-2014 §§ 19.4.2, 19.6, Exh. 1 to Harris Response [Doc. # 41-1], at ECF 16; November 2015 Davis Report [Doc. # 36-4], at ECF 18-21; Declaration of Kevin R. Davis [Doc. # 41-5], at 2 ¶¶ 9-10, 3 ¶ 12, 4 ¶ 15.

Trippe also contends that Davis's "creep" theory—that the insulation covering battery wires inside the Trippe UPS gradually deteriorated from the wires' constant contact with fixed portions of the UPS, which created detrimental arcing—is not supported sufficiently in the scientific literature. First, Trippe does not cite to authority rejecting the creep theory completely, but instead acknowledges that the NFPA delineates "very narrow circumstances" in which creep may cause a fire.[37] Further, Eagar provides some support for "creep" as an accepted scientific concept in his deposition and affidavit.[38] As noted, Eagar's report also supports Davis's conclusions regarding the ignition and sequence of the fire.[39] Further, significantly, Davis considered and eliminated various potential alternate causes for the fire, and has provided reasons for his conclusions that demonstrate he generally followed procedures and engaged in analysis that appear to be consistent with accepted protocol in fire investigations as suggested by NFPA 921.[40] The Court is persuaded that Davis has developed his theories using the same rigor as accepted in the fire investigation industry. *See Kumho Tire,* 526 U.S. at 152.

Trippe also argues that certain of Davis's views are not endorsed by Harris's third expert, Eagar. Any such disagreements or purported weaknesses in Davis's

---

[37]  *See* Motion [Doc. # 36], at 18.

[38]  *See* Affidavit of Thomas W. Eagar, dated January 19, 2017, Exh. 6 to Harris Response ("Affidavit of Thomas W. Eagar") [Doc. # 41-6], at 3 ¶ 8, at ECF 3; Deposition of Thomas W. Eagar, Exh. E to Motion [Doc. # 36-8], at 19 lines 21-24, 20 lines 1-24, 59 lines 2-12, at ECF 6, 16.

[39]  *See* Eagar Report [Doc. # 41-6], at 2-5, 14, at ECF 3-6, 15.

[40]  *See* November 2015 Davis Report [Doc. # 36-4], at ECF 18-21; Declaration of Kevin R. Davis [Doc. # 41-5], at 2 ¶¶ 9-10, 3 ¶ 12, 4 ¶ 15.

testimony go to its weight rather than admissibility. *See Jones v. Halliburton Co.*, Civil Action No. 4:07–cv–2719, 2011 WL 1841148, at *3 (S.D. Tex. May 13, 2011) ("[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.") (quoting *United States v. 14.38 Acres of Land,* 80 F.3d 1074, 1077 (5th Cir. 1996)).

Therefore, Davis's opinions are sufficiently grounded in methodology, technical theory, specialized knowledge, and logic to satisfy the Court's *Daubert* gatekeeping responsibility. The Court will allow Davis's expert testimony and Trippe will be free to test his conclusions and methodology through cross-examination, to enable the jury to decide whether these opinions are credible and deserve weight.

### D. Thomas W. Eagar

Harris retained Thomas W. Eagar, Sc.D., to respond, as a rebuttal expert, to Trippe's expert disclosures. Eagar is a professor of Materials Engineering and Engineering Systems at Massachusetts Institute of Technology ("MIT"), and has been on its faculty since 1976.[41] Eagar is a member of the American Society of Mechanical Engineers and the National Academy of Engineering, among other organizations, and is the author of numerous publications related to metals and the effect of heat on metals.[42] He has conducted analyses on more than one hundred metallurgical and forensic engineering projects and has qualified as an expert in

---

[41] CV of Thomas W. Eagar, Exh. 6-A to Harris Response ("CV of Thomas W. Eagar") [Doc. # 41-6], at 1, at ECF 4.

[42] *Id.* at 4-23, at ECF 7-26.

state and federal courts and international arbitrations for over three decades.[43]

Eagar reviewed Davis's report, dated November 11, 2015. On April 11, 2016, Eagar inspected the items Ellington had segregated as evidence from the north and south carts at the time of the fire, and that Davis tested.[44] Eagar also reviewed Trippe's disclosure of expert testimony and the written reports and deposition testimony of Trippe's retained experts.[45] Based on the foregoing, as well as his experience and education in materials engineering, heat flow, physics, and failure analysis, Eagar formed several rebuttal opinions in response to Trippe's experts' reports.[46]

Trippe's objections to Eagar's opinions, like those made with respect to Ellington and Davis, actually are challenges to the weight of Eagar's testimony. Trippe argues, for example, that Eagar's opinion that the battery packs in the Trippe UPS could leak electric current is speculative and unreliable because Eagar did not perform any tests to determine whether his theory was possible. Trippe makes a similar argument with respect to Eagar's theory that heat produced by the alleged leak ignited lint in the UPS unit that, in turn, ignited the plastic bezel on the front of the Trippe UPS: Trippe asserts that the opinion is speculative because Eagar failed to test the flammability of the plastic on the front of the Tripp UPS. Trippe also argues that Eagar's opinions regarding compromised insulation of battery wires, offered in addition to the battery leakage theory, are speculative and

---

[43] Affidavit of Thomas W. Eagar [Doc. # 41-6], at 1 ¶ 2; *see also* CV of Thomas W. Eagar, [Doc. # 41-6], at 1-12, at ECF 27-38 (identifying testimony Eagar has given since 2012).

[44] Affidavit of Thomas W. Eagar [Doc. # 41-6], at 2 ¶ 4.

[45] *Id.*

[46] *See generally* Eagar Report [Doc. # 41-6].

unreliable.[47] The Court has carefully reviewed Eagar's report, deposition, and affidavit, and concludes that his testimony is adequately tethered to accepted technical knowledge and methodology. Eagar's experience, logic, and specialized skills in various pertinent subject areas satisfy applicable legal standards. He explains in detail the bases of his conclusions. Trippe's disagreements go to the weight of his testimony and are matters that may be explored through cross-examination before a jury.

## III.    CONCLUSION

For the reasons discussed above, Defendant Trippe Manufacturing Company's Motion to Strike and Exclude the Testimony of Plaintiff's Expert Witnesses [Doc. # 36] is **DENIED**.

SIGNED at Houston, Texas, this 7th day of **February, 2017**.

_____
NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE

---

[47] Some of these criticisms, such as the lack of flammability tests, may be unfounded in light of Trippe's own expert's deposition testimony.